UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KELLEY-ROSS & ASSOCIATES, INC., <br><br> Plaintiff, <br><br> v. <br><br> EXPRESS SCRIPTS, INC., <br><br> Defendant. | C22-0148 TSZ <br><br> ORDER <br><br> **REDACTED**[1] |

THIS MATTER comes before the Court on cross-motions for summary judgment, docket nos. 96 & 67. Having reviewed all papers filed in support of, and in opposition to, the cross-motions, the Court enters the following order.

**Background**

Plaintiff Kelley-Ross & Associates, Inc. is a pharmacy group operating two relevant pharmacies in Seattle. Oftebro Decl. at ¶ 2 (docket no. 97). Plaintiff's Long-Term Care pharmacy has been the trusted pharmacy services partner for safety net providers, adult family homes, disabled communities, and skilled nursing facilities in Seattle for over twenty years. Id. Plaintiff's Retail Pharmacy offers a unique set of

---

[1] An unredacted version of this Order, which includes the pricing terms from the contract provisions, has been filed under seal.

ORDER - 1

services, and it is the primary pharmacy provider for a large population of vulnerable patients in Seattle's urban core.  Id.

Plaintiff's services include, among others, therapeutic protection for those vulnerable populations from Human Immunodeficiency Virus ("HIV") infection through Plaintiff's "One-step PrEP" Program.  Id. at ¶ 3.  "PrEP" stands for "pre-exposure prophylaxis," a medication regiment that protects a person from contracting HIV despite potential exposure to the virus.  Id.  The One-Step PrEP Program helps vulnerable populations to avoid contracting HIV using the drug known as Truvada,[2] whether in its brand-label or generic format.[3]  Id.  The parties agree that Truvada and generic Truvada qualify as specialty medications.[4]  Pl.'s Mot. at 12 (docket no. 96); Def.'s Reply at 9 (docket no. 93).

Defendant Express Scripts, Inc. is a Pharmacy Benefits Manager ("PBM").  Oftebro Decl. at ¶ 4 (docket no. 97).  As a PBM, Defendant processes claims for

---

[2] Pursuant to Federal Rule of Evidence 201(b), the Court GRANTS Defendant's request to take judicial notice of the United States Patent and Trademark Office Registration for Truvada, Reg. No. 2,915,213, see Ex. 12 to Knepper Decl. (docket no. 83-12), a public record filed with the United States Patent and Trademark Office.  See Cave Man Kitchens Inc. v. Caveman Foods, LLC, 2:18-CV-01274, 2019 WL 3891327, at *2 (W.D. Wash. Aug. 19, 2019) (noting that the Court may take judicial notice of "authentic documents recorded with a governmental agency" including "public records filed with the U.S. Patent and Trademark Office" (citations omitted)); see also Oroamerica Inc. v. D & W Jewelry Co., Inc., 10 Fed. Appx. 516, 517 n.4 (9th Cir. 2001) (granting request for judicial notice of public records filed with the U.S. Patent and Trademark Office).

[3] The parties refer to the generic version of Truvada as "generic Truvada" or Emtricitabine Tenofovir Disoproxil Fumarate ("ETDF").  In this Order, the Court uses the term "generic Truvada."

[4] Specialty medications "treat chronic, rare and complex disease states, and frequently require special handling and patient monitoring."  Ex. F to Scalia Decl. (docket no. 98 at 37).  Truvada is a specialty medication because it requires patient monitoring and adherence programs, and it is only available through specialty pharmacies.  Oftebro Decl. at ¶ 8 (docket no. 97).

ORDER - 2

insurance coverage of prescription medication benefits for a large number of plan sponsors.  Id.  For a pharmacy like Plaintiff to provide services to a patient whose benefits are managed by Defendant, the pharmacy must be in contract with Defendant.  Id.  This case concerns several Pharmacy Provider Agreements between Plaintiff and Defendant.[5]  Id. at ¶ 5.  The Pharmacy Provider Agreements and the amendments to the Pharmacy Provider Agreements are referred to as the "Provider Agreement."

A.     **The Provider Agreement**

The Provider Agreement sets forth the rates by which Plaintiff will be reimbursed for dispensing medication.  Section 3.1.a of the Provider Agreement states:

> 3.1.a **Payment for Covered Medications/Clean Claims**.  For services performed in accordance with the terms and conditions of this Agreement, [Express Scripts] shall pay Provider the agreed upon rates, as set forth in the applicable rate exhibit, less the applicable Copayment.

Provider Agreement at § 3.1.a, Ex. A to Oftebro Decl. (docket no. 97 at 12).  The "rate exhibit" is titled "Exhibit A – ES1000" ("ES1000").  ES1000, Ex. B to Oftebro Decl. (docket no. 97).  Section 2.1(b) of the ES1000 explains how reimbursements will be calculated for Covered Medications:

> 2.     **Provider Reimbursement for Covered Medications**.
>
> 2.1    For Covered Medications dispensed to Members under this [ES1000], Provider shall receive reimbursement equal to the lowest of the following . . . :

---

[5] Although there are four contracts between the parties, the parties agree that the contracts contain the same operative language.  Pl.'s Mot. at 3 n.1 (docket no. 96); Def.'s Mot. at 2 (docket no. 67); Oftebro Decl. at ¶ 5 (docket no. 97).

ORDER - 3

. . . .

        (b)       the applicable AWP[6] discount plus applicable dispensing fee as set forth in section 2.4 (or per the applicable Supplemental Schedule).

ES1000 at 1, Ex. B to Oftebro Decl. (docket no. 97 at 56).  As relevant here, section 2.4.a of the ES1000 provides the following rate exhibit:

| | BRANDS | GENERICS - A | GENERICS - B |
|---|---|---|---|
| **30 Day Network Participation** | | | |
| Year 1 | ■ | ■ | ■ |
| Year 2 | ■ | ■ | ■ |
| Year 3 | ■ | ■ | ■ |
| **90 Day Network Participation**(3.3) | | | |
| Year 1 | ■ | ■ | ■ |
| Year 2 | ■ | ■ | ■ |
| Year 3 | ■ | ■ | ■ |

ES1000 at § 2.4.a, Ex. B to Oftebro Decl. (docket no. 97 at 57); Ex. 6 to Knepper Decl. (docket no. 86 at 3); Beach Dep. at 58:11–59:17, Ex. 2 to Knepper Decl. (docket no. 84).

      In November or December 2016, Defendant notified Plaintiff that in order to dispense specialty medications, Plaintiff would have to undergo additional credentialing and agree to new contractual terms and conditions, becoming a "Specialty Pharmacy." Oftebro Decl. at ¶ 9 (docket no. 97); Ex. C to Oftebro Decl. (docket no. 97 at 65–69).

---

[6] The Provider Agreement uses a metric called Average Wholesale Price or AWP to set reimbursement rates.  Parker Decl. at ¶ 3 (docket no. 82).  Defendant does not set the AWP.  Id. at ¶ 4.  AWP is a standard metric published by an independent third-party used in the PBM industry for reimbursement rates.  Id.

ORDER - 4

Defendant informed Plaintiff that upon receiving its credential, a new contract would be presented setting forth new rates of reimbursement for the dispensation of specialty medications. Oftebro Decl. at ¶ 9 (docket no. 97).

After Plaintiff completed the specialty credentialing, Plaintiff and Defendant signed a "Specialty Amendment to the Express Scripts, Inc. Pharmacy Provider Agreement" (the "Specialty Amendment"). Specialty Amendment, Ex. A to Oftebro Decl. (docket no. 97 at 27–31). The Specialty Amendment provides in part as follows:

> 3.1   The following definition of Covered Specialty Medications is hereby added to the Definitions section of Exhibit A – ES1000:
>
> **"Covered Specialty Medications"** shall mean those Covered Medications that are (i) set forth in the Schedule S Specialty Drug Program, as further described in Attachment 1 to this Exhibit, attached hereto and incorporated herein by this reference; and (ii) covered by Sponsor.

Specialty Amendment at § 3.1, Ex. A to Oftebro Decl. (docket no. 97 at 27).

The Specialty Amendment also added "Attachment 1" to the ES1000. Attachment 1, Ex. A to Oftebro Decl. (docket no. 97 at 32–54). Attachment 1 provides as follows:

> **1.1   For the particular Covered Specialty Medications** dispensed and administered to Sponsor's Members, Participating Provider shall receive reimbursement equal to the lowest of the following, at the rates in the contract rates table below:
>
> . . . .
>
> (b) the applicable AWP discount plus dispensing fee;

Attachment 1 at § 1.1, Ex. A to Oftebro Decl. (docket no. 97 at 32). Section 1.2 of Attachment 1 states:

ORDER - 5

1.2 Such payment shall constitute payment in full for the Covered Specialty Medication dispensed including any supplies and services necessary for injection and administration, and represents the entire reimbursement for the service. Notwithstanding the foregoing, the parties acknowledge and agree that Sponsor remains the ultimate decision-maker with respect to the participation of any provider and the medications covered under Sponsor's Prescription Drug Program.

Attachment 1 at § 1.2, Ex. A to Oftebro Decl. (docket no. 97 at 32). Section 1.2 of Attachment 1 also provides the following "contract rate table" and list of Covered Specialty Medications (the "Covered Specialty Medications table"):

|        | BRANDS | GENERICS - A | GENERICS - B |
|--------|--------|--------------|--------------|
| Year 1 | ■      | ■            | ■            |
| Year 2 | ■      | ■            | ■            |
| Year 3 | ■      | ■            | ■            |

| COVERED SPECIALTY MEDICATIONS ||||| 
|---|---|---|---|---|
| AFINITOR | GLEEVEC | NEUPOGEN | SEROSTIM | TECFIDERA |
| ATRIPLA | GONAL-F RFF REDI-JECT | NORVIR | SIMPONI | TIVICAY |
| CELLCEPT | HARVONI | ORENCIA | SOVALDI | TRIUMEQ |
| CIMZIA | HUMIRA | OTEZLA | SPRYCEL | TRUVADA |
| COMPLERA | IBRANCE | POMALYST | STELARA | VIEKIRA PAK |
| COPAXONE | INTELENCE | PREZISTA | STRIBILD | VIREAD |
| ENBREL | ISENTRESS | PROGRAF | SUSTIVA | XELJANZ |
| EPZICOM | KALETRA | PULMOZYME | SUTENT | XIAFLEX |
| FOLLISTIM AQ | MENOPUR | REVLIMID | TARCEVA | XTANDI |
| FORTEO | NEULASTA | REYATAZ | TASIGNA | ZYTIGA |

Attachment 1 at § 1.2, Ex. 6 to Knepper Decl. (docket no. 86 at 10); Attachment 1 at § 1.2, Ex. A to Oftebro Decl. (docket no. 97 at 32). If a medication is not covered under section 1.2 of Attachment 1, that medication is reimbursed pursuant to section 1.3 of Attachment 1:

ORDER - 6

> 1.3   **For All Other Covered Medications that are Not a Covered Specialty Medication**.  Participating Provider shall be reimbursed in accordance with the 30 Day and 90 Day (if applicable) rates then in effect for the applicable network configuration utilized by the Sponsor in which Provider participates pursuant to this [ES1000].

Attachment 1 at § 1.3, Ex. A to Oftebro Decl. (docket no. 97 at 32).

B.   **Defendant Reimburses Plaintiff for Generic Truvada**

Pursuant to section 1.3 of Attachment 1, Defendant reimbursed Plaintiff for generic Truvada at the Generics - A rate listed in section 2.4.a of the ES1000.  Beach Dep., Ex. 2 to Knepper Decl. at 58:11–59:17 (docket no. 84).  Plaintiff believes it should have been reimbursed pursuant to the Generics - A rate in § 1.2 of Attachment 1.  Pl.'s Mot. at 11 (docket no. 96).  Plaintiff alleges it lost over $400.00 for every generic Truvada prescription it filled for its patients because Defendant reimbursed Plaintiff less than Plaintiff's actual cost for obtaining generic Truvada.  Oftebro Decl. at ¶ 11 (docket no. 97).  Plaintiff initiated this lawsuit to recover $294,936.19, the difference between what Defendant paid and what Defendant allegedly owed Plaintiff under the Provider Agreement between October 1, 2020 and April 30, 2021.[7]  Id.  Plaintiff's only remaining claim is its claim for breach of contract.[8]  With respect to the pending cross-motions, the

---

[7] This is the length of time that generic Truvada was available as a "Generics - A" medication, meaning generic Truvada was made by only one manufacturer during this time, as opposed to a "Generics - B" medication.  Pl.'s Mot. at 6 (docket no. 96).

[8] Plaintiff's complaint brought claims against defendant for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the Washington Consumer Protection Act ("WCPA").  Pl.'s Compl. (docket no. 1-1).  In a previous order, the Court dismissed Plaintiff's claims for breach of the covenant of good faith and fair dealing and for violation of WCPA without prejudice and with leave to amend.  Order at 15 (docket no. 26).  Plaintiff's amended complaint brought claims for breach of contract and breach of the covenant of good faith and fair dealing.  Pl.'s Am. Compl. (docket no. 27).  In a

ORDER - 7

parties agree that there are no material facts in dispute and the Court should interpret the Provider Agreement as a matter of law.  Pl.'s Mot. at 2 (docket no. 96); Def.'s Mot. at 1 & 8 n.7 (docket no. 67).

**Discussion**

A.      **Summary Judgment Standard**

The Court shall grant summary judgment if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (2010).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A fact is material if it might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving party need not negate the opponent's claim, Celotex, 477 U.S. at 323; rather, the moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, Anderson, 477 U.S. at 249.  To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn.  Id. at 255, 257.  When the record taken as a whole, could not lead a rational trier of fact to find for the non-moving party, summary judgment is warranted.  See, e.g., Beard v. Banks, 548 U.S. 521, 529 (2006).  "Where

---

previous minute order, the Court dismissed Plaintiff's claim for breach of the covenant of good faith and fair dealing with prejudice and without leave to amend.  Minute Order at 1 (docket no. 33).

ORDER - 8

1 cross motions are at issue, the court must 'evaluate each motion separately, giving the
2 nonmoving party in each instance the benefit of all reasonable inference.'" Oliver v.
3 Alcoa, Inc., C16-0741, 2017 WL 1498140, at *8 (W.D. Wash. Apr. 25, 2017) (quoting
4 ACLU of Nev. v. City of Las Vegas, 466 F.3d 784, 790–91 (9th Cir. 2006)).

**B.     Contract Interpretation under Washington Law**

The Provider Agreement states that "[t]his Agreement shall be construed and governed in all respects according to the internal laws in the State of Washington without regard to conflict of law principles." Provider Agreement at § 7.8, Ex. A to Oftebro Decl. (docket no. 97 at 19). The parties also agree that Washington law applies. See Pl.'s Mot. at 7–8 (docket no. 96); Def.'s Mot. at 9 (docket no. 67). Washington courts follow the "objective manifestation" theory of contracts. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503, 115 P.3d 262 (2005). Under this approach, the focus is on "the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Id. Words in a contract are assigned their reasonable, "ordinary, usual, and popular" meaning unless the agreement "clearly demonstrates a contrary intent." Id. at 503–04. If the parties' intent can be divined from the actual words within the four corners of the document, extrinsic evidence will not be considered. See id. at 503–04. If the Court must resort to extrinsic evidence to interpret the agreement, it may do so only to determine the meaning of specific words and terms used in the contract, and not to infer an intent "independent of the instrument" or to "vary, contradict, or modify" what was written. Id. at 503; see also id. at 504 (Washington courts "do not interpret what was intended to be written but what was written" (clarifying

ORDER - 9

1  the holding of <u>Berg v. Hudesman</u>, 115 Wn.2d 657, 801 P.2d 222 (1990))).  Extrinsic

2  evidence may consist of testimony concerning the events surrounding the formation of

3  the contract, as well as the subsequent conduct of the parties.  <u>Id.</u> at 502 (citing <u>Berg</u>, 115

4  Wn.2d at 667–68).

5  **C.     Interpretation of the Provider Agreement Between Plaintiff and Defendant**

6        Plaintiff contends that, pursuant to the Provider Agreement, generic Truvada is "a

7  Covered Specialty Medication because the equivalent brand-name medication, Truvada,

8  is listed on the Covered Specialty Medications table."  Pl.'s Mot. at 8 (docket no. 96).

9  Defendant counters that the Provider Agreement does not require it to reimburse generic

10 Truvada as a Covered Specialty Medication because generic Truvada is not listed on the

11 Covered Specialty Medications table.  Def.'s Mot. at 1, 9–10 (docket no 67).  The dispute

12 thus centers on whether generic Truvada qualifies as a Covered Specialty Medication

13 under the Provider Agreement, which defines "Covered Specialty Medications" as "those

14 Covered Medications that are (i) set forth in the Schedule S Specialty Drug Program, as

15 further described in Attachment 1 to this Exhibit, attached hereto and incorporated herein

16 by this reference; and (ii) covered by Sponsor."  Specialty Amendment at § 3.1, Ex. A to

17 Oftebro Decl. (docket no. 97 at 27).  In turn, Attachment 1 provides the Covered

18 Specialty Medications table and the reimbursement rates for Covered Specialty

19 Medications.  Attachment 1 at § 1.2, Ex. A to Oftebro Decl. (docket no. 97 at 32).  If a

20 medication is not a Covered Specialty Medication, the medication is reimbursed pursuant

21 to section 1.3 of Attachment 1.  Attachment 1 at § 1.3, Ex. A to Oftebro Decl. (docket no.

22 97 at 32).  As relevant here, pursuant to section 1.3 of Attachment 1, if generic Truvada is

23

ORDER - 10

1 not a Covered Specialty Medication, generic Truvada would be reimbursed pursuant to
2 the rate listed in section 2.4.a of the ES1000.  ES1000 at § 2.4.a, Ex. B to Oftebro Decl.
3 (docket no. 97 at 57).  Plaintiff believes it should have been reimbursed pursuant to the
4 Generics - A rate in section 1.2 of Attachment 1.  Pl.'s Mot. at 11 (docket no. 96).  On the
5 other hand, Defendant contends it properly reimbursed Plaintiff pursuant to section 1.3 of
6 Attachment 1.  Def.'s Mot. at 7 (docket no. 67).

7    In interpreting a contract, the Court must first look to the actual words used within
8 the four corners of the contract.  See Braddock v. Zaycon Foods, LLC, C16-1756, 2019
9 WL 3974355, at *4 (W.D. Wash. Aug. 22, 2019) ("If the parties' intent can be divined
10 from the actual words within the four corners of the document, extrinsic evidence will not
11 be considered." (citing Hearst Commc'ns, 153 Wn.2d at 503)).  The Provider Agreement,
12 as modified, provided a Covered Specialty Medications table and the reimbursement rates
13 for brand-name medications, Generics - A medications, and Generics - B medications.
14 Attachment 1, Ex. A to Oftebro Decl. (docket no. 97 at 32).  The parties agree that the
15 Covered Specialty Medications table lists only brand-name medications.  Pl.'s Mot. at 9
16 (docket no. 96); Def.'s Mot. at 4 (docket no. 67).  In other words, Truvada, a brand-name
17 medication, is listed as a Covered Specialty Medication but generic Truvada is not,[9] and
18 the Provider Agreement does not state that listing a brand-name medication in the

---

[9] The trademark "Truvada" can refer only to the medication made by Gilead Sciences, Inc. and sold under the name "Truvada," thereby distinguishing Truvada from other medications, including medications with the same composition.  See Soc. Techs. LLC v. Apple Inc., 4 F.4th 811, 817 (9th Cir. 2021) (quoting 15 U.S.C. § 1127)).  Because Truvada is distinguishable from generic Truvada, Defendant referred only to the brand-name medication when it included Truvada in the Covered Specialty Medications table.

ORDER - 11

Covered Specialty Medications table means that the generic version of the brand-name medication is also a Covered Specialty Medication.

Plaintiff argues that Defendant's interpretation of the Provider Agreement renders a portion of the Provider Agreement meaningless. Pl.'s Mot. at 11–13 (docket no. 96). Specifically, Plaintiff contends that under Defendant's interpretation of the Provider Agreement, the "Generics - A" rate and the "Generics - B" rate in Attachment 1 would never apply because only brand-name medications are listed in the Covered Specialty Medications table. Pl.'s Mot. at 12. The Provider Agreement, however, gave Defendant "sole discretion" to amend the Covered Specialty Medications table. Attachment 1 at § 2.1, Ex. A to Oftebro Decl. (docket no. 98 at 32–33). In other words, Defendant had the discretion to add generic medications to the Covered Specialty Medications table. It never did so. Thus, Defendant's interpretation of the Provider Agreement does not render a portion of the Provider Agreement meaningless or superfluous because if Defendant exercised its discretion to add a generic medication to the Covered Specialty Medications table, that generic medication would be reimbursed according to the Generics - A rate or the Generics - B rate in section 1.2 of Attachment 1.

In sum, the Covered Specialty Medications table lists Truvada but not generic Truvada as a Covered Specialty Medication. Truvada is distinguishable from generic Truvada and the Provider Agreement does not state that listing a brand-name medication in the Covered Specialty Medications table means that the generic version of the medication is also a Covered Specialty Medication. The Court concludes as a matter of law that generic Truvada is not a Covered Specialty Medication under the Provider

ORDER - 12

Agreement, and Defendant properly reimbursed Plaintiff for generic Truvada at the Generics - A rate listed in section 2.4.a of the ES1000.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) Defendant's cross-motion, docket no. 67, is GRANTED, and Plaintiff's motion, docket no. 96, is DENIED.

(2) The Court having previously dismissed Plaintiff's claims for breach of the covenant of good faith and fair dealing and for violation of the Washington Consumer Protection Act, see Order (docket no. 26); Minute Order (docket no. 33), and all claims against all parties having now been resolved, the Court DIRECTS the Clerk to enter Judgment consistent with the Court's ruling in this matter.

(3) The Clerk is directed to send a copy of this Order and the Judgment to all counsel of record.

IT IS SO ORDERED.

Dated this 26th day of October, 2023.

Thomas S. Zilly
United States District Judge